**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**
**PITTSBURGH DIVISION**

| | | |
|---|---|---|
| THE WESTERN PA ELECTRICAL EMPLOYEES INSURANCE TRUST FUND, Individually, and on Behalf of All Others Similarly Situated, | ) ) ) ) ) | CIVIL ACTION No.:_____ |
| Plaintiff, | ) ) | <u>COMPLAINT-CLASS ACTION</u> |
| vs. | ) ) | |
| WESTERN ASSET MANAGEMENT COMPANY, LLC, FRANKLIN RESOURCES, INC., and STEPHEN KENNETH LEECH, II, | ) ) ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | ) ) ) | |

<u>**CLASS ACTION COMPLAINT FOR**</u>
<u>**VIOLATIONS OF FEDERAL SECURITIES LAWS**</u>

The Western PA Electrical Employees Insurance Trust Fund ("Plaintiff" or "WPEE"), by and through its undersigned counsel, brings this action under the Securities Exchange Act of 1934, 15 U.S.C. §78, (the "Exchange Act") on behalf of itself and a class of other similarly situated investors against Western Asset Management Company, LLC ("WAMCO" or the "Company"), Franklin Resources, Inc. ("Franklin"), and Stephen Kenneth Leech, II ("Leech") (collectively, "Defendants"). Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the ongoing investigation conducted by and through Plaintiff's attorneys, which include, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and other public statements, recent filings in SEC and U.S. Department of Justice actions against Leech, as well as news stories, analyst reports, other public information concerning Defendants and the industry within which they operate.

## I.    NATURE OF THE ACTION

1.    This is a securities class action on behalf of all persons and entities that purchased and/or otherwise acquired shares of the "Western Asset US Core Bond Fund" mutual fund classes – Class I (ticker: "WATFX"), Class A (ticker: "WABAX"), Class C (ticker: "WABCX"), Class FI (ticker: "WAPIX"), Class IS (ticker: "WACSX"), and Class R (ticker: "WABRX") – and the "Western Asset Core Plus Bond Fund" mutual fund classes – Class A (ticker: "WAPAX"), Class C (ticker: "WAPCX"), Class C1 (ticker: "LWCPX"), Class FI (ticker: "WACIX"), Class R (ticker: "WAPRX"), Class I (ticker: "WACPX"), Class IS (ticker: "WAPSX") – between January 1, 2021 and October 31, 2023, inclusive (the "Class Period"). Plaintiff's claims arise under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5(a), (b), and (c) promulgated thereunder.

## II.    JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and subsections (a) through (c) of Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5(a)-(c).

3.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

4.    Venue is proper pursuant to 15 U.S.C. §78aa and 28 U.S.C. §1391(b) because, at all relevant times, Plaintiff is and was based in this District, received materially false and misleading information from Defendants in this District, and was damaged due to the federal securities violations alleged herein in this District.

5.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone and wire communications, and the facilities of national securities exchanges.

## III.    PARTIES

### A.    Plaintiff

6.    Plaintiff Western PA Electrical Employees Insurance Trust Fund is a multiemployer-defined benefit union pension fund based in Pittsburgh, Pennsylvania.  As set forth in the attached Certification, Plaintiff acquired shares of one of the mutual fund classes of Western Asset US Core strategy during the Class Period and was damaged due to the federal securities violations alleged herein.

### B.    Defendants

7.    WAMCO is a limited liability company, SEC-registered investment advisor, and specialist investment manager headquartered in Pasadena, California.  WAMCO's investment products include, but are not limited to, mutual, private, and closed-end funds.  WAMCO also

provides investment management and advisory services for fixed income portfolios and investment management services to institutions.  WAMCO is also contracted by registered mutual funds and private funds to manage their investment portfolios and by other investment advisors as a sub-advisor.

8.      Franklin is a financial services holding company with subsidiaries operating under multiple brand names, including Franklin Templeton and WAMCO.  In July 2020, Franklin acquired Legg Mason, Inc. ("Legg Mason"), a financial services company that was a parent entity to WAMCO.  Upon acquiring Legg Mason, Franklin became WAMCO's ultimate parent entity.

9.      Leech served as WAMCO's Chief Investment Officer ("CIO") between 1998 and 2008 and again between March 2014 and September 2023, when he became co-CIO with another WAMCO employee.  Leech served as WAMCO co-CIO until August 21, 2024, when he took a leave of absence from the Company.  During his time with WAMCO, Leech served as portfolio manager for numerous of WAMCO's strategies.

IV.     **BACKGROUND**

A.      **WAMCO's Investment "Strategies"**

10.     As an investment advisor, WAMCO manages numerous different investments that are categorized into separate investment "strategies."  Leech served as portfolio manager for many of WAMCO's strategies.  A portfolio manager is a financial professional who, while working with a team of professionals, makes investment decisions and executes trades for an underlying investment.

11.     The three WAMCO "strategies" at issue here are the Western Asset Macro Opportunities strategy ("Macro Opps" or the "Macro Opps strategy"), the Western Asset US Core strategy ("Core" or the "Core strategy"), and the Western Asset Core Plus strategy ("Core Plus" or "Core Plus strategy").

### B.    WAMCO's Macro Opps Strategy

12.    At all relevant times, WAMCO's Macro Opps strategy purported to pursue an "opportunistic investment strategy" that sought to "identify and capitalize on attractive relative-value opportunities principally in fixed income markets around the globe by investing in a variety of securities and other instruments[.]"

13.    During the Class Period, Macro Opps invested in several different asset types, including cash securities and related derivatives, including U.S. Treasuries and U.S. Treasury derivatives, investment grade corporate bonds, high yield bonds, and mortgage-backed securities.

14.    While investors had multiple methods of investing in WAMCO's Macro Opps strategy, including via "private fund" and "separately managed account," the most prominent Macro Opps investment vehicles were its underlying mutual fund classes.

15.    A mutual fund is a type of SEC-registered investment company that pools money from many investors and invests the money in various assets.

16.    At all relevant times, Macro Opps had at least five separate mutual fund "classes," each with its own corresponding ticker symbol – Class A (ticker "LAAAX"), Class C (ticker "LAACX"), Class FI (ticker "LAFIX"), Class I (ticker "LAOIX"), and Class IS ("LAOSX") – in which investors could purchase shares.

17.    Throughout the Class Period, the Macro Opps strategy had more than $13 billion assets under management ("AUM") and in addition to serving as WAMCO's CIO, Leech served as its lead portfolio manager.

### C.    WAMCO's Core and Core Plus Strategies

18.    At all relevant times, WAMCO's Core strategy purported to "[s]eek[] to maximize [its] total return from a high-quality, U.S. dollar denominated core fixed-income portfolio" and

WAMCO's Core Plus strategy purported to "[s]eek[] to maximize total return via an actively managed, well-diversified core fixed income strategy[.]"

19.     Like Macro Opps, Core and Core Plus also invested in multiple different asset types, including cash securities and related derivatives, including U.S. Treasuries and U.S. Treasury derivatives, investment grade corporate bonds, high yield bonds, and mortgage-backed securities during the Class Period.

20.     Also like the Macro Opps strategy, investors had multiple methods of investing in the Core and Core Plus strategies, and the most prominent method was via one of the Core and Core Plus mutual fund "classes": Core Class I (ticker "WATFX"), Core Class A (ticker "WABAX"), Core Class C (ticker "WABCX"), Core Class FI (ticker "WAPIX"), Core Class IS (ticker "WACSX"), Core Class R (ticker "WABRX"), Core Plus Class A (ticker: "WAPAX"), Core Plus Class C (ticker: "WAPCX"), Core Plus Class C1 (ticker: "LWCPX"), Core Plus Class FI (ticker: "WACIX"), Core Plus Class R (ticker: "WAPRX"), Core Plus Class I (ticker: "WACPX"), and Core Plus Class IS (ticker: "WAPSX").

21.     Throughout the Class Period, the Core and Core Plus strategies had more than $44 billion and $122 billion in AUM, respectively, and, like Macro Opps, Leech served as a Core and Core Plus portfolio manager.

### D.     WAMCO's Fee Structure and Leech's Compensation

22.     During the Class Period, WAMCO charged its strategies one or both of the following two types of fees: an asset-based management fee ("management fee"), whereby WAMCO earned a fee based on a percentage of overall AUM in a given strategy; and a performance-based fee ("performance fee"), whereby WAMCO earned a fee based on the given strategy's profits.

23.     Throughout the Class Period, WAMCO charged each of its Core and Core Plus mutual fund classes annual fees of 0.40% of AUM, but did not charge its Core strategy any performance-based fees.  During that same time frame, WAMCO charged higher fees to its Macro Opps strategy mutual fund classes, charging annual fees of 1.15% of AUM, in addition to certain performance fees to Macro Opps.

24.     As a result of the difference in fee structures between the Core/Core Plus and Macro Opps strategies, each dollar in AUM in a Macro Opps fund was worth between three and four times as much in fee-based revenue for WAMCO than a dollar in AUM in a Core or Core Plus mutual fund class.

25.     Additionally, throughout the Class Period, Leech's compensation was based in part on the management and performance fees generated by the strategies that he managed, including Core, Core Plus, and Macro Opps.  After all WAMCO expenses were paid, Leech generally received approximately half of WAMCO's profits in the form of cash incentive compensation.

26.     In other words, the greater the fees earned by Leech's strategies, the greater the compensation – in the form of salary and bonus – earned by Leech.

**E.      Trade Allocations**

27.     As portfolio manager, Leech had responsibility for trading the underlying assets of the strategies that he managed.  At all relevant times, Leech was assisted by one or more dedicated trade assistants, as well as other personnel in WAMCO's trade operations group ("WAMCO Team").

28.     During the Class Period, Leech primarily traded in Treasury futures and options on Treasury futures.

29.     Leech typically began trading around 8 AM Eastern Time each morning and placed dozens of trades every day utilizing an "omnibus" account with each broker with whom he placed

trades.  An "omnibus" account allows investment advisers like Leech to buy and sell assets on behalf of multiple clients – here, WAMCO's multiple strategies – without telling the applicable broker the specific client for which a trade is intended, or on behalf of, at the time of the trade.

30.     During the Class Period, Leech (with assistance from his WAMCO Team) traded with at least seven different brokers on behalf of the WAMCO strategies he managed, and for six of them, Leech had no default "allocation instructions" for the assets he traded.  A default "allocation instruction" is a preset guideline to trade an asset for a certain client, unless otherwise instructed; and the absence of any instruction means that the six brokers who lacked such instruction needed to be manually informed at some point that day by Leech (and his WAMCO Team) for which account he was trading after that trade took place.

31.     At all relevant times, Leech had full discretion to trade on behalf of the WAMCO strategies for which he served as portfolio manager and full discretion to allocate trades among any of the strategies he managed.

32.     Prior to and during the Class Period, WAMCO filed annual Forms ADV with the SEC and relevant state authorities.  In its annual Part 2A Brochure, WAMCO assured its clients that "[i]nvestment allocations are done in a manner that [WAMCO] believes is fair and equitable, with the presumption that similarly situated clients should generally participate in similar investment opportunities and trades[,]" in addition to maintaining "a variety of policies and practices that are designed to reduce the potential for favoritism" and "a variety of oversight mechanisms to monitor for situations that might suggest further inquiry would be prudent or that raise potential concerns."

## V.    DEFENDANTS ALLOCATED PROFITABLE TRADES TO WAMCO'S MACRO OPPS STRATEGY AND UNPROFITABLE TRADES TO WAMCO'S CORE AND CORE PLUS STRATEGIES

### A.    Defendants Failed to (i) Use WAMCO's Electronic Trade Management System and (ii) Allocate Trades in a Timely Fashion

33.    At all relevant times, WAMCO maintained an electronic trade management system ("ETMS") to allow portfolio managers to prepare draft trade tickets and specify an allocation instruction before placing a trade, or, at the latest, shortly thereafter.

34.    Unlike most WAMCO portfolio managers, Leech and his WAMCO Team did not use WAMCO's ETMS to trade.

35.    Leech and his WAMCO Team instead predominately placed trades over the telephone, whereby Leech called his brokers' registered representatives and audibly instructed them on which trades to place.

36.    At the time they placed their trades, Leech and his WAMCO Team generally did not document or communicate the intended allocations of the trades.

37.    Nor did Leech and his WAMCO Team generally allocate their trades even shortly thereafter.

38.    Instead, Leech and his WAMCO Team typically waited until the end of each trading day, often hours after Leech and his WAMCO Team had received confirmation that the trade had taken place and, critically, *after they were able to observe price changes in the investments they made using a Bloomberg screen that Leech had displayed on his computer monitors at his home and in his office*.

39.    Only after observing the movement in price of a particular investment would Leech provide his WAMCO Team with each trade's allocation, often via another telephone call.  Leech's WAMCO Team would then enter each trade's allocations into WAMCO's ETMS for processing.

**B.    Defendants Schemed to Favor WAMCO's Macro Opps Strategy at the Expense of WAMCO's Core and Core Plus Strategies in Allocating Trades**

40.    As noted above, throughout the Class Period, WAMCO pursued largely the same investment strategies for its Macro Opps, Core, and Core Plus strategies and as portfolio manager of each strategy, Leech worked with his WAMCO Team to trade Treasury products on behalf of both strategies.

41.    Further, as also noted above, WAMCO earned significantly greater fees from its Macro Opps strategy than its Core and Core Plus strategies, and Leech's compensation was based in part on the fees generated by the strategies that he managed, as well as WAMCO's overall company profit.

42.    As a result, throughout the Class Period, Defendants favored WAMCO's Macro Opps strategy at the expense of other WAMCO strategies, including Core and Core Plus.  In practice, this meant disproportionately allocating more than $600 million-worth of realized and unrealized "net first-day gains" to Macro Opps – *i.e.*, trades that collectively *increased* in value by $600 million – while simultaneously allocating more than $600 million-worth of realized and unrealized "net first-day losses" to strategies like Core and Core Plus – *i.e.*, trades that collectively *decreased* in value by $600 million.  This practice is referred to as "cherry-picking."

43.    Examples of Defendants' cherry-picking scheme abound.

44.    On June 17, 2021, Leech and his WAMCO Team sold call options on thirty-year Treasury bonds multiple times.  That day, they allocated a trade at a strike price of $159 per contract and a loss of more than $1,000,000 to disfavored strategies like Core and Core Plus.  Then, later in the day, they allocated a trade at a strike price of $160.50 per contract and a gain of approximately $35,000 that they split between favored and disfavored strategies, like Macro Opps

and Core/Core Plus, respectively.  And then they allocated a better trade – at a strike price of $161 per contract and a gain of approximately $164,000 – to favored strategies, like Macro Opps.

45.    On July 6, 2022, Leech and his WAMCO Team bought and sold ten-year Treasury futures multiple times.  They allocated approximately $200,000 in gains on intra-day trades to favored strategies like Macro Opps, and approximately $220,000 in losses on intra-day trades to disfavored strategies like Core and Core Plus.

46.    On July 13, 2022, Leech and his WAMCO Team bought and sold five-year Treasury futures multiple times.  They allocated approximately $2,200,000 in gains on intra-day trades to favored strategies like Macro Opps, and approximately $240,000 in losses on intra-day trades to disfavored strategies like Core and Core Plus.

47.    On August 5, 2022, Leech and his WAMCO Team bought and sold ten-year Treasury futures multiple times.  They allocated approximately $33,000 in gains on intra-day trades to favored strategies like Macro Opps, and approximately $690,000 in losses on intra-day trades to disfavored strategies like Core and Core Plus.

48.    During the Class Period, favored strategies, like Macro Opps, had 34 consecutive months of net first-day gains, while disfavored strategies, like Core and Core Plus, had net first-day losses in every month.

49.    Additionally, during the Class Period, when directing an allocation, Leech and his WAMCO Team allocated more than 90% of trades with more than $1 million in first-day gains to favored strategies, like Macro Opps, and more than 90% of trades with more than $1 million in first-day losses to disfavored strategies, like Core and Core Plus.

50.    Similarly, during the Class Period, Leech and his WAMCO Team also allocated more than 90% of trades with more than $500,000 in first-day gains to favored strategies, like

Macro Opps, and more than 90% of trades with more than $500,000 in first-day losses to disfavored strategies, like Core and Core Plus.

51.    Further, during the Class Period, approximately 80% of the Treasury futures and options trades that Leech and his WAMCO Team allocated to favored strategies like Macro Opps had first-day gains, while approximately 20% of the Treasury futures and options trades that Leech and his WAMCO Team allocated to favored strategies like Macro Opps had first-day losses.  The opposite was true with respect to the disfavored strategies: only approximately 25% of the Treasury futures and options trades that Leech and his WAMCO Team allocated to disfavored strategies like Core and Core Plus had first-day gains, while approximately 75% of the Treasury futures and options that Leech and his WAMCO Team allocated to disfavored strategies had first-day losses.

52.    In sum, investors in disfavored strategies like Core and Core Plus lost out on over $600 million-worth of "first-day gains" and were saddled with over $600 million-worth of "first-day losses" as a result of Defendants' scheme.

**C.    Defendants' Scheme Impossible for Ordinary Investors to Detect**

53.    At no point during the Class Period did Defendants disclose to investors that Defendants were orchestrating a scheme to favor certain strategies, like Macro Opps, at the expense of other strategies, like Core and Core Plus.

54.    Absent disclosure, cherry-picking is virtually impossible for ordinary investors to detect on their own.

55.    In general, mutual fund investors are unable to see how their investment advisers and portfolio managers – like WAMCO and Leech – allocates trades and instead rely on their investment advisers and portfolio managers to provide investment advice and execute trades that

is in the investors' best interest, to prioritize investors' financial interests over the investment adviser's and portfolio manager's own interests, and to fully disclose all material facts.

56.    Additionally, the larger size of the disfavored strategies – for example, Core and Core Plus had over $44 billion and $122 billion in AUM, respectively, during the Class Period, while Macro Opps had over $13 billion AUM during the Class Period – also made it difficult to detect Defendants' scheme.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

57.    Starting in at least 2019 and continuing throughout the Class Period, in each annual Form ADV Part 2A Brochure ("ADV Brochure") filed with the SEC and all relevant state authorities, WAMCO assured its clients that it:

> ***[M]aintains a variety of policies and practices that are designed to reduce the potential for favoritism. [WAMCO] maintains compliance policies and procedures that it believes are reasonably designed to result in fair allocations of investment opportunities to clients over time***, even though a specific trade allocation may have the effect of benefiting one or more accounts over other accounts when viewed in isolation. [WAMCO] frequently bunches (or aggregates) orders to minimize execution costs and optimize the implementation of investment strategies for clients.
>
> ***Investment allocations are done in a manner that [WAMCO] believes is fair and equitable, with the presumption that similarly situated clients should generally participate in similar investment opportunities and trades.***

[Emphasis added].

58.    Additionally, in the same document, WAMCO stated that it "maintains a variety of oversight mechanisms to monitor for situations that might suggest further inquiry would be prudent or that raise potential concerns."

12

59. The ADV Brochures referenced above were filed on June 30, 2019, June 30, 2020, December 15, 2021, and December 1, 2022.[1]

60. The foregoing statements, when made during the Class Period, were materially false and/or misleading when made and omitted material information in violation of a duty to disclose such information because they failed to state or disclose the following adverse facts pertaining to WAMCO's business, operations, and financial condition, which were known to Defendants or recklessly disregarded by them as follows:

(a) throughout the Class Period, Defendants favored certain WAMCO strategies, like Macro Opps, over other WAMCO strategies, like Core and Core Plus;

(b) throughout the Class Period, Defendants disfavored certain WAMCO strategies, like Core and Core Plus;

(c) any "compliance policies and procedures" that WAMCO maintained "to result in fair allocations of investment opportunities to clients" were either insufficient to ensure that Leech and his WAMCO Team fairly allocated trades among the strategies they managed or were expressly disregarded by Defendants in order to allow the favoring of certain WAMCO strategies at the expense of other WAMCO strategies; and

(d) any "oversight mechanisms" that WAMCO maintained were either insufficient to monitor Leech and his WAMCO Team or were expressly disregarded by

---

[1] The referenced quotes are all identical in each ADV Brochure, except in 2022, when the first misstatement begins with the statement that WAMCO "maintains policies and procedures . . ." instead of stating that WAMCO "maintains *a variety of* policies and *practices* . . ." and is otherwise identical. [Emphasis added].

Defendants in order to allow the favoring of certain WAMCO strategies at the expense of other WAMCO strategies.

## VII.    DEFENDANTS' MOTIVE AND OPPORTUNITY TO COMMIT FRAUD PROVIDES ADDITIONAL EVIDENCE OF THEIR SCIENTER

61.    All Defendants benefited from the above-alleged scheme in multiple ways.

62.    As noted above, WAMCO earned significantly greater fees from its Macro Opps strategy than its Core and Core Plus strategies, incentivizing WAMCO to favor Macro Opps and disfavor Core and Core Plus in allocating first-day gains and first-day losses.

63.    Franklin also shared the same incentive to maximize its subsidiary's – WAMCO's – profitability.

64.    As noted above, Leech's compensation was based in part on the fees generated by the strategies that he managed, as well as WAMCO's overall company profit, incentivizing him to similarly favor Macro Opps and disfavor Core and Core Plus.

65.    Additionally, Leech earned compensation in the form of "deferred compensation," which is a method of investing compensation earned for payment on a later date, potentially after it has increased in value because it was invested.  During the Class Period, Leech invested his own deferred compensation in favored strategies, like Macro Opps, while decreasing his investment in disfavored strategies, like Core and Core Plus.

66.    For example, in March 2023 – during which Leech and his WAMCO Team allocated trades with more than $100 million in net first-day gains to favored strategies and more than $100 million in net first-day losses to disfavored strategies – Leech increased his deferred compensation investment in Macro Opps strategies from approximately $142,000 to approximately $19 million.

67.     That same month, March 2023, Leech reduced his deferred compensation account investment in disfavored strategies, like Core and Core Plus, down to $5.6 million, from approximately $19.4 million in January 2023.  Later, by August 2023, Leech would further reduce his deferred compensation account investments in disfavored strategies like Core and Core Plus to approximately $143,000.

68.     Moreover, Leech's reputation also benefited from the scheme.  For example, in December 2021, Leech received accolades from WAMCO's Chief Executive Officer ("CEO") for achieving positive annual returns in a Macro Opps private fund.  The CEO called the results a "fantastic outcome."  Two years later, on April 1, 2023, the director of WAMCO's London operations sent Leech an email with the subject line "Re: MO [Macro Opps]" stating, "+4.63% YTD – nothing else comes close[.] Well done [K]en!!"

## VIII.   NO SAFE HARBOR

69.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled herein, as the statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent any of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and were unaccompanied by meaningful cautionary statements that identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

70.     Alternatively, to the extent that the statutory safe harbor is found to apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for such statements because, at the time each such statements were made, the speaker had actual knowledge that it was materially false or misleading, and/or the statement was authorized or approved by an executive

officer of WAMCO and/or Franklin who knew that the statements were materially false or misleading when made.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

71.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

72.    During the Class Period, as detailed herein, Defendants engaged in a manipulative scheme and made materially false and misleading statements and omissions.  As a result, Defendants' actions operated as a fraud or deceit on the Class (defined *infra* ¶73), artificially reducing the price of the "Western Asset US Core strategy" mutual fund classes during the Class Period, damaging Class members.

## X.    CLASS ACTION ALLEGATIONS

73.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased and/or otherwise acquired the "Western Asset US Core Bond Fund" and the "Western Asset Core Plus Bond Fund" mutual fund classes during the Class Period (the "Class").  Excluded from the Class are Defendants, WAMCO's and Franklin's officers and directors, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

74.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Western Asset US Core Bond Fund and Western Asset Core Plus Bond Fund mutual fund classes were actively traded.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there could be hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained

by Defendants or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

77.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants made public statements during the Class Period that were materially false, misleading, or incomplete or otherwise omitted material facts;

(c)    whether Franklin and Leech caused WAMCO to issue false and misleading statements;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading statements; and

(e)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

78.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.    CAUSES OF ACTION

### COUNT I
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(b) Promulgated Thereunder
### (Against All Defendants)

79.    Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.  This claim is asserted on behalf of all members of the Class against all Defendants.

80.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  Defendants are sued as primary participants in the wrongful conduct charged herein.

81.    During the Class Period, Defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.    Pursuant to the above fraudulent device, scheme, artifice, act, practice, or course of business, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the materially false, misleading, and incomplete statements detailed above.

83.    By virtue of their positions at either WAMCO or Franklin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, and intended thereby to deceive Plaintiff and the other members of the Class.  Alternatively, Defendants acted with reckless disregard for the truth in that they recklessly failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, even though such facts were readily available to Defendants.

18

84.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class have suffered damages in connection with their purchases of Core and Core Plus mutual fund classes during the Class Period.

85.     By reason of the conduct alleged herein, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a) & (c) Promulgated Thereunder**
**(Against all Defendants)**

86.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

87.     This Count is brought under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiff need not allege in this Count, nor prove in this case, that the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

88.     During the Class Period, Defendants carried out a common device, scheme, artifice, act, practice, or course of business that was intended to, and did, deceive the investing public, including Plaintiff and the Class.

89.     In furtherance of this unlawful scheme, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business, including "cherry-picking" that allocated profitable trades to WAMCO's Macro Opps strategy fund classes and unprofitable trades to WAMCO's Core and Core Plus strategies fund classes, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

90.     Plaintiff and the Class reasonably relied upon both the integrity of the market in which the Core and Core Plus strategies fund classes traded, as well as Defendants' pronouncements, including that WAMCO "maintains a variety of policies and practices that are designed to reduce the potential for favoritism[,]" "[i]nvestment allocations are done in a manner that [WAMCO] believes is fair and equitable, with the presumption that similarly situated clients should generally participate in similar investment opportunities and trades[,]" and that WAMCO "maintains a variety of oversight mechanisms to monitor for situations that might suggest further inquiry would be prudent or that raise potential concerns."

91.     During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Core and Core Plus strategies fund classes, or if they had, would not have done so at the artificially inflated prices paid for such securities.

92.     As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Core and Core Plus strategies fund classes during the Class Period.

93.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of Core and Core Plus strategies fund classes during the Class Period.

## COUNT III
### Violations of Section 20(a) of the Exchange Act
### (Against Leech and Franklin)

94.     Plaintiff repeats and realleges each allegation contained above as if fully set forth herein.

95.     This Count is asserted on behalf of Plaintiff and all members of the Class against Leech and Franklin for violations of §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

96.     Leech and Franklin were and acted as controlling persons of WAMCO within the meaning of §20(a), as alleged herein.  By virtue of: (i) Leech's high-level positions with WAMCO and role as portfolio manager of WAMCO's Maco Opps, Core, and Core Plus strategies; (ii) Franklin's ownership of WAMCO and employment of Leech; and (iii) both Leech's and Franklin's participation in, and/or awareness of, WAMCO's operations and/or intimate knowledge of WAMCO's actual performance, Leech and Franklin had the power to influence and control and did influence and control, directly or indirectly, WAMCO's decision-making, including the content and dissemination of the various statements which Plaintiff contends are false and misleading, and the fraudulent device, scheme, artifice, act, practice, or course of business described in this complaint.  Leech and Franklin were provided with, or had unlimited access to, copies of WAMCO's statements, including each WAMCO annual Form ADV Brochure alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  Leech and Franklin also had the ability to prevent the fraudulent device, scheme, artifice, act, practice, or course of business described in this complaint from occurring.

97.     In addition, Leech and Franklin had direct involvement in WAMCO's day-to-day operations and, therefore, are presumed to have had the power to control or influence the transactions giving rise to the securities violations as alleged herein and exercised the same.

98.     As set forth above, each Defendant individually violated §10(b) and Rule 10b-5 by their statements, omissions, and fraudulent acts as alleged in this complaint.  By virtue of their control over WAMCO, Leech and Franklin are also liable for WAMCO's violation of §10(b) pursuant to §20(a).

## XII.   PRAYER FOR RELIEF

99.     WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding all damages and other remedies available under the Exchange Act in favor of Plaintiff and the members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

100.    Plaintiff demands a trial by jury.

DATED:  July 3, 2025             _/s/ John J. Richardson_____
                                John J. Richardson (PA 86045)
                                Kirk B. Burkley (PA 89511)
                                **BERNSTEIN BURKLEY ATTORNEYS AT LAW**
                                601 Grant Street, 9th Floor
                                Pittsburgh, PA 15219
                                Telephone: 412-456-8108
                                Fax: 412-456-8135
                                jrichardson@bernsteinlaw.com

kburkley@bernsteinlaw.com

*Local Counsel for Plaintiff Western PA Electrical Employees Insurance Trust Fund*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Donald A. Broggi (PA 85514)
Thomas L. Laughlin, IV (*pro hac vice* forthcoming)
Jeffrey P. Jacobson (*pro hac vice* forthcoming)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: 212-233-6444
Facsimile: 212-233-6334
dbroggi@scott-scott.com
tlaughlin@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Plaintiff Western PA Electrical Employees Insurance Trust Fund*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Thomas R. McIntyre, on behalf of The Western PA Electrical Employees Insurance Trust Fund ("WPEE"), herby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am Chairman of the Board of Trustees of WPEE. I am authorized to make legal decisions on behalf of WPEE.

2.      I have reviewed the Class Action Complaint filed in this matter (the "Complaint"), and authorize the filing of this Certification and a comparable Complaint and/or motion for appointment as Lead Plaintiff on behalf of WPEE.

3.      WPEE is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.      During the Class Period (as defined in the Complaint), WPEE purchased and/or sold the security that is the subject of the Complaint as set forth on the attached Schedule A.

5.      WPEE did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.      During the three-year period preceding the date on which this Certification is signed, WPEE has neither served nor sought to serve as a representative party on behalf of a class in a private action arising under the Securities Act or the Exchange Act.

7.      WPEE will not accept any payment for serving as a representative party on behalf of the Class beyond its *pro rata* share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2025.

**THE WESTERN PA ELECTRICAL EMPLOYEES INSURANCE TRUST FUND**

Thomas R. McIntyre
Chairman, Board of Trustees

# Schedule A

**WESTERN ASSET CORE BOND-IS**       **Ticker:**  **WACSX**     **Cusip:**     **957663677**

Class Period: 01/01/2021 to 10/31/2023

**Western PA Electrical Employees Insurance Trust Fund**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| **Purchases:** | 1/4/2021 | 765 | $13.67 |
| | 2/1/2021 | 556 | $13.52 |
| | 3/1/2021 | 628 | $13.25 |
| | 3/9/2021 | 361,026 | $13.06 |
| | 4/1/2021 | 1,138 | $13.07 |
| | 5/3/2021 | 1,373 | $13.17 |
| | 6/1/2021 | 1,256 | $13.19 |
| | 6/18/2021 | 1,765 | $13.21 |
| | 6/18/2021 | 607 | $13.21 |
| | 7/1/2021 | 1,264 | $13.25 |
| | 8/2/2021 | 1,301 | $13.39 |
| | 9/1/2021 | 1,205 | $13.37 |
| | 10/4/2021 | 1,185 | $13.21 |
| | 11/1/2021 | 1,267 | $13.16 |
| | 12/1/2021 | 2,183 | $13.14 |
| | 1/3/2022 | 1,436 | $13.11 |
| | 2/1/2022 | 1,214 | $12.73 |
| | 3/1/2022 | 1,316 | $12.46 |
| | 4/1/2022 | 1,502 | $12.03 |
| | 5/2/2022 | 1,657 | $11.44 |
| | 6/1/2022 | 1,703 | $11.49 |
| | 7/1/2022 | 1,800 | $11.18 |
| | 8/1/2022 | 1,895 | $11.47 |
| | 9/1/2022 | 2,010 | $11.09 |

| | | |
|---|---|---|
| 10/3/2022 | 2,225 | $10.45 |
| 11/1/2022 | 2,110 | $10.24 |
| 12/1/2022 | 2,237 | $10.71 |
| 1/3/2023 | 2,479 | $10.60 |
| 2/1/2023 | 2,108 | $11.03 |
| 3/1/2023 | 2,232 | $10.66 |
| 4/3/2023 | 2,585 | $10.88 |
| 5/1/2023 | 2,301 | $10.91 |
| 6/1/2023 | 2,585 | $10.72 |
| 7/3/2023 | 2,714 | $10.66 |
| 8/1/2023 | 2,474 | $10.64 |
| 9/1/2023 | 2,812 | $10.51 |
| 10/2/2023 | 2,861 | $10.11 |